**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **CITY BANK,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-09-CV-96-KC** |
| | § | |
| **COMPASS BANK,** | § | |
| | § | |
| **Defendant**. | § | |

*- consolidated with -*

| | |
|---|---|
| **COMPASS BANK,** | § |
| | § |
| **Plaintiff,** | § |
| | § |
| **v.** | § |
| | § |
| **ADELINA V. SAMBRANO,** | § |
| **individually and as Independent** | § |
| **Executor of the ESTATE OF** | § |
| **HUMBERTO F. SAMBRANO,** | § |
| **Deceased; and CITY BANK,** | § |
| | § |
| **Defendants**. | § |

## <u>ORDER</u>

On this day, the Court considered Compass Bank's Motion for Summary Judgment

("Compass Bank S.J. Motion") (Doc. No. 44), Compass Bank's Motion to Dismiss for Lack of

Standing ("Compass Bank 12(b)(1) Motion") (Doc. No. 45), City Bank's Motion for Leave to

File Second Amended Complaint ("City Bank Motion to Amend Complaint") (Doc. No. 49),

City Bank's Motion to Strike (Doc. No. 57), Compass Bank's Motion for Leave to File

Amended Reply ("Compass Bank Motion to Amend Reply") (Doc. No. 61), and the Supplement

to the Motion to Intervene as Third Party Plaintiff (the "Miller Supplement") (Doc. No. 70), and

the attachments (the "Miller Pleadings I" and "Miller Pleadings II") (Doc. Nos. 70-1, 70-2) filed

by J. Marshall Miller ("Miller") in response to this Court's Order dated April 6, 2010 ("Miller

Order") (Doc. No. 69). The Court also considered the various responses and replies to the

above-noted filings.

For the reasons set forth below, the Court:

(1) **FINDS** the Miller Pleadings filed with the Miller Supplement to be adequate and so

**REFERS** the subject matter discussed therein to the bankruptcy court;

(2) **GRANTS** in part and **DENIES** in part the Compass Bank 12(b)(1) Motion;

(3) **GRANTS** in part and **DENIES** in part the Compass Bank S.J. Motion;

(4) **SEVERS**, on its own motion, the surviving tort claim alleged by City Bank against

Compass Bank, and **CONSOLIDATES** that claim into cause number EP-10-CV-62-KC;

(5) **DENIES** the City Bank Motion to Amend Complaint as **MOOT**;

(6) **GRANTS** the Compass Bank Motion to Amend Reply;

(7) **DENIES** City Bank's Motion to Strike as **MOOT**,

(8) **STAYS**, on its own motion, further proceedings in this case until the bankruptcy

court has resolved the matters referred to it; and,

(9) **ORDERS** the parties to file a joint report on the outcome of the bankruptcy

proceedings one week after they have concluded.

## I.    BACKGROUND

To the extent that this section sets forth facts and regards them as true, they are derived

from admissions in the pleadings, or from deposition and documentary evidence submitted in

this case to which no objection has been lodged, and which is not contradicted by other

submitted evidence.

The Sambrano Corporation ("SamCorp") was formerly a general contracting firm based in El Paso, Texas, which specialized in the construction of larger commercial and government buildings.  Steven Sambrano Dep. 28:2-34:10, Dec. 15, 2009 ("S. Sambrano Dep.") (Doc. No. 51-14).[1]  It is now defunct.  S. Sambrano Dep. 199:20-202:23.  In September 2005, SamCorp obtained a three million dollar revolving line of credit from City Bank (the "City Bank loan" or "City Bank line of credit").  *See* City Bank's First Amended Compl. ¶ 7 ("City Bank Compl.") (Doc. No. 17).  The purpose of this line of credit was to replace an older and smaller line of credit that SamCorp had with Chase Bank, with the higher limit supporting corporate expansion.  S. Sambrano Dep. 44:10-46:3;  *see also* Ann Rush Dep. 50:18-24, Nov. 12, 2009 ("Rush Dep.") (Doc. No. 51-16).[2]  Two years later, in September 2007, SamCorp obtained a four million dollar revolving line of credit from State National Bank (the "State National loan" or "State National line of credit"), for the purpose of refinancing the City Bank loan and providing another million dollars of borrowing capacity for corporate expansion purposes.  S. Sambrano Dep. 83:13-89-16; *see also* Compass Bank's First Am. Compl. For Judicial Foreclosure ¶ 9 ("Compass Bank Compl.") (Doc. No. 24).  Since that time, Compass Bank has become State National Bank's successor in interest for all matters relating to this case, and the two names may be regarded as interchangeable for present purposes.  Compass Bank Compl. ¶ 8.

---

[1]   Steven Sambrano is the son of the late Humberto Sambrano, founder of SamCorp, and was a principal of the company for many years before its collapse.  *See* S. Sambrano Dep. 30:11-31:16.

[2]   Ann Rush is a City Bank employee who dealt with the SamCorp account and was deposed in a representative capacity.  *See* Rush Dep. 6:13-16.

City Bank, for its part, took a security interest over SamCorp's receivables at the time the line of credit was opened, in 2005.  *See* City Bank Commercial Security Agreement (Doc. No. 51-26).  Compass Bank also sought a lien against these receivables when it opened its line of credit in 2007, but its priority, if at all, is behind City Bank's lien, which was filed earlier.  *See* Ray L. Owen Dep. 76:7-77:8, Dec. 21, 2009 ("Owen Dep.") (Doc. No. 50-9);[3] *see also* S. Sambrano Dep. 102:9-17.  Compass Bank also sought other assets as additional collateral at the time that the new line of credit was opened.  Owen Dep. 79:9-21.  Both banks obtained personal guarantees from various members of the Sambrano family over the loans in question.  S. Sambrano Dep. 80:3-21, 105:4-106:1.

Critically, during the "late fall" of 2007, when advances were being made on the new State National line of credit, the City Bank line of credit was not paid off using the proceeds from the new loan.[4]  S. Sambrano Dep. 123:6-124:21; *see also* Michael F. Tynan Dep. 86:3-6,

---

[3]     Ray L. Owen was an executive with State National Bank who was in charge of its El Paso operations during the time of the SamCorp transactions.  *See* Owen Dep. 16:22-17:16.

[4]     Ann Rush provides testimony which contradicts the notion that all parties to the State National loan had the original intent to apply the proceeds of the State National loan to retire the City Bank loan, and instead states that Compass Bank officials must have knowingly participated in the SamCorp deception.  Rush Dep. 146:5-18.  However, she admits to having no personal knowledge of the state of mind or intentions of any of the relevant actors, and rests her conclusion entirely on inference.  Rush Dep. 146:19-147:7.  The testimony of individuals actually involved in the transaction – Steven Sambrano, for SamCorp, and Michael Tynan, for Compass Bank (then State National Bank) – was that the proceeds from the State National loan were intended to be used to retire the City Bank loan.  *See* S. Sambrano Dep. 123:6-124:21; *see also* Tynan Dep. 150:7-151:15.  However, Faustino Flores, the CFO of SamCorp, pleaded the fifth when confronted with this question.  *See* Faustino Flores Dep. 144:6-20, Dec. 14, 2009 ("Flores Dep.") (Doc. No. 51-7).

150:7-151:15, Nov. 16, 2009 ("Tynan Dep.") (Doc. No. 51-11).[5]  Instead, the advances on the

State National line of credit were used for general corporate purposes, while substantial sums

remained outstanding on the City Bank loan.  S. Sambrano Dep. 125:10-19.  Obtaining the State

National line of credit advances without retiring the City Bank line of credit was explicitly

prohibited under certain agreements in place between City Bank and SamCorp.  City Compl.

¶ 11; *see also* City Bank Addendum "A" to Loan Agreement (Doc. No. 51-27 Ex. 27) ("No

additional debt in excess of $100,000 will be incurred by either the borrower or guarantors.").

Moreover, this failure to retire the old debt violated the terms of the new State National loan.

Owen Dep. 99:17-100:4 ("Q.  [I]f, in fact, SamCorp at that time had not paid off City Bank,

would SamCorp have been in default on its loan with State National?  A. Yes.").  Furthermore,

SamCorp insiders realized that having both lines of credit open and drawn down at the same

time would not be looked upon favorably by the banks, and could lead to complications.  S.

Sambrano Dep. 127:17-128:2.

　　　　Within a few months of SamCorp's drawing on the State National line of credit without

retiring the City Bank line, both banks became aware – almost at the same time – of this

situation.  Rush Dep. 12:2-17; *see also* Owen Dep. 106:10-108:1.  This came about in mid-

January 2008, when Tynan, then still with State National Bank, had lunch with executives from

City Bank in order to discuss the prospect of his switching employers.  Rush Dep. 16:9-13; *see*

*also* Owen Dep. 108:2-6; *see also* Tynan Dep. 256:8-259:8.  At that lunch, Tynan was asked

about which customers he was serving at State National.  Rush Dep. 17:5-11; *see also* Tynan

---

[5]　　　　Michael Tynan ("Tynan") was the State National Bank employee who worked directly with SamCorp on their loan transactions with that bank.  *See* Tynan Dep. 22:24-23:18, 85:11-86:19.

Dep. 256:8-259:8.  Among other customers, he named SamCorp.  Tynan Dep. 258:5-9.  At that point in time, he was not aware of the fact that the City Bank loan had not been paid off.  *See* Owen Dep. 109:4-110:7; *see also* Tynan Dep. 183:21-185:2, 233:20-24.  This revelation of SamCorp's relationship with another bank prompted City Bank to investigate, which quickly uncovered evidence that the two loans were outstanding simultaneously.  Rush Dep. 13:23-14:11.  City Bank executives then communicated this fact to Compass Bank, which responded by expressing a lack of interest in working cooperatively to resolve the SamCorp matter.  *Id*. at 14:7-15:4; *see also* Owen Dep. 131:17-132:7.

This touched off a headlong race, on the part of both banks, to obtain as much additional security, collateral, and cash as possible, in the days and weeks following these revelations.  *See* S. Sambrano Dep. 147:23-148:22.  Compass Bank took several actions.  One action concerns a certain EDI Financial brokerage account, which was titled to members of the Sambrano family at the time the State National line of credit was extended in September 2007.  Compass Bank Compl. ¶ 12.  When extending that loan, State National contracted for a security interest in that brokerage account.  *Id.*  After the default was discovered, Compass Bank sought to obtain control over the securities in that account, in order to protect its security interest, and thus had the account transferred to a brokerage company which it controlled.  *See* Owen Dep. 146:13-20.  In another action, Compass Bank also took custody of a certificate representing 7,500 shares of Bank of the West stock,[6] as new and additional collateral over the loan, and allegedly in consideration for a forebearance agreement.  Compass Bank Compl. ¶ 14.  After taking these steps in connection with this collateral, but failing to receive a cash repayment of the loan,

---

[6]     The Bank of the West stock, together with the EDI account, will be collectively referred to as the "Disputed Assets."

Compass Bank then filed suit against the Sambranos on July 24, 2008, and as part of that suit it seeks to foreclose its liens on the Disputed Assets, liquidate them, and apply the proceeds to the outstanding loan balance. *See generally* Compass Bank Compl.; *see also* Order, Mar. 13, 2009, at 1 ("Severance Order") (Doc. No. 1).

City Bank, for its part, executed a forebearance agreement with members of the Sambrano family in February 2008, which allegedly forbade them from disposing of any of their assets for less than full consideration. City Bank Compl. ¶ 21. Under the terms of that agreement, the Sambranos were also supposed to pay back in full the City Bank indebtedness, by the end of March 2008. *Id.* The Sambranos tendered $864,355.54 on March 3, but they failed to pay the agreed sum of $2,135,664.46 later in the month to fully satisfy the debt. Rush Dep. 119:18-120:15. Within a few months of their failure to pay, City Bank filed suit in state court against various members of the Sambrano family. An agreed judgment was entered, and, in order to release the judgment, the Sambrano family turned over approximately six hundred thousand dollars of additional assets, which are separate and apart from the assets claimed by Compass Bank. *Id.* at 123:7-126-24. Subsequently, in October 2009, City Bank received an additional $113,700, which constituted proceeds from a SamCorp joint venture with Turner Construction Company. *Id.* at 126:25-127:14.

Starting with its original Answer and Counterclaim, filed on August 25, 2008, City Bank objected to Compass Bank's plan to sell the Disputed Assets and apply the proceeds to the State National loan, on the grounds that the Sambranos' grant of security interests over them, or the transfer of them to Compass Bank's custody, amounted to a fraudulent transfer. City Bank Compl. ¶ 29; *see also* Severance Order 1-2. City Bank also claims that Compass Bank converted $1,000,000 worth of accounts-receivable proceeds when, in the latter part of December 2007,

-7-

SamCorp deposited a $1,075,806.54 check (the "million dollar payment") from the City of El Paso in its Compass Bank operating account and ordered Compass Bank to apply $1,000,000 from that account towards paying down the State National line of credit.  City Bank Compl. ¶¶ 26, 28.  Shortly after the new year, about two weeks after these funds were applied to the State National line of credit, the  million dollars was re-advanced to SamCorp in two installments.  Tynan Dep. 203:18-205:16, 217:6-218:5; *see also* Owen Dep. 123:3-13 (stating that by January 23, 2008, the State National line of credit was fully drawn at $4,000,000).  City Bank also avers that Compass Bank's actions in connection with its loan to SamCorp amounted to tortious interference with contract, which led to unspecified damages.  City Bank Compl. ¶ 30.

On August 22, 2008, the Hartford Fire Insurance Company ("The Hartford"), the surety bond provider for SamCorp, filed an involuntary bankruptcy petition against the Sambranos and SamCorp.  Severance Order 2; *see also* S. Sambrano Dep. 48:1-18.  The Hartford assumed control of SamCorp's business, sending its personnel to El Paso to supervise the completion of ongoing construction projects and to take control of SamCorp's head office administration.  S. Sambrano Dep. 199:20-202:23.  In connection with this bankruptcy filing, an automatic stay on claims against the Sambranos and SamCorp took effect, which was lifted by the bankruptcy court on March 26, 2009, to allow City Bank and Compass Bank to pursue their claims against each other, and against the Disputed Assets, in this Court.  *See* Bankr. Clarification Order, Nov. 30, 2009, at 1 (Doc. No. 41-1).

After discovery was conducted, Compass Bank filed a Motion for Summary Judgment on January 18, 2010.  *See* Compass Bank S.J. Mot. (Doc. No. 44).  At the same time, Compass Bank also filed a Motion to Dismiss City Bank's Texas Uniform Fraudulent Transfers Act Claims.  *See* Compass Bank 12(b)(1) Mot.  Responses to and replies in support of these motions

were duly filed.  *See* City Bank's Resp. to Compass Bank's Mot. For Summ. J. ("City Bank S.J. Resp.") (Doc. No. 51), City Bank's Resp. to Compass Bank's Mot. to Dismiss ("City Bank 12(b)(1) Resp.") (Doc. No. 52), Compass Bank's Amended Reply to City Bank's Resp. to Mot. for Summ. J. ("Compass Bank S.J. Reply") (Doc. No. 61-1), Compass Bank's Reply to City Bank's Reponse Regarding Mot. to Dismiss ("Compass Bank 12(b)(1) Reply") (Doc. No. 56).

In the context of these responses and replies, Compass Bank objected to City Bank's Proposed Undisputed Facts and to the Affidavit of Ann Rush, which City Bank had proffered in its Response.  *See* Compass Bank's Obj. to the Proposed Stipulated Facts Submitted by City Bank ("Compass Bank Stip. Facts Obj.") (Doc. No. 55-1), Compass Bank's Obj. to the Aff. of Ann Rush ("Compass Bank Rush Aff. Obj.") (Doc. No. 55-2).  City Bank responded to these objections.  *See* City Bank's Resp. to Compass Bank's Obj. to the Aff. of Ann Rush ("City Bank Rush Aff. Resp.") (Doc. No. 62), City Bank's Resp. to Compass Bank's Obj. to the Proposed Undisputed and Disputed Facts Submitted by City Bank ("City Bank Stip. Facts Resp.") (Doc. No. 63).  Compass Bank replied and re-urged its objections to these filings.  *See* Compass Bank's Reply to City Bank's Resp. to Compass Bank's Obj. to the Proposed Stipulated Facts Submitted by City Bank ("Compass Bank Stip. Facts Reply") (Doc. No. 65), Compass Bank's Reply to City Bank's Resp. to the Obj. of Compass Bank to the Aff. of Ann Rush ("Compass Bank Rush Aff. Reply") (Doc. No. 66).

Also in the context of these responses and replies, City Bank moved to strike Compass Bank's Reply in support of its summary judgment motion, on the grounds that this Reply had exceeded the page limit, or in the alternative, grant City Bank leave to file extra pages to match Compass Bank's extra pages.  *See* City Bank's Mot. to Strike Compass Bank's Reply to City Bank's Resp. to Mot. for Summ. J. ("City Bank Mot. to Strike") (Doc. No. 57).  Compass Bank

responded to this Motion by stating that the filing of the over-long document was an inadvertent oversight, apologizing to the Court for it, and asking for leave either to exceed page limits in this matter or substitute a shorter version of its Reply brief.  *See* Compass Bank's Reply to City Bank's Mot. to Strike and Request for Leave to Amend ("Compass Bank Strike Reply") (Doc. No. 59), Compass Bank's Mot. for Leave to Amend Reply ("Compass Bank Mot. to Amend Reply") (Doc. No. 61).

Shortly after Compass Bank filed the aforementioned Motions, on January 27, 2010, City Bank moved to amend its Complaint to include additional claims for breach of contract, money had and received, and negligence, arising out of the SamCorp matter.  *See* City Bank's Mot. for Leave to File Second Am. Compl. ("City Bank Mot. to Amend Compl.") (Doc. No. 49) ¶ 3. Compass Bank responded in opposition to City Bank's Motion to amend its Complaint.  *See* Compass Bank's Objection to City Bank's Mot. for Leave to File Second Amended Compl. ("Compass Bank Obj. to Amending Compl.") (Doc. No. 53).  Because Compass Bank opposed that amendment, City Bank also filed suit over those claims in state court.  City Bank Mot. to Amend Compl. ¶ 3.  The state court case has since been removed, and is pending before this Court under the caption *City Bank v. Compass Bank*, No. EP-10-CV-62-KC.  *See* Notice of Related Cases (Doc. No. 64).  Additional motions are pending in that case.  *See* Dkt. Rpt. for EP-10-CV-62-KC.

Miller, SamCorp's bankruptcy trustee, moved to intervene in this case on January 29, 2010, in order to assume City Bank's fraudulent transfer claims in case City Bank no longer had standing to pursue such claims.  *See* Mot. to Intervene as Third Party Pl. ("Miller Mot.") (Doc. No. 50).  Compass Bank opposed Miller's joinder.  *See* Compass Bank's Objection to the Mot. to Intervene as Third Party Pl. ("Compass Bank Miller Obj.") (Doc. No. 54).  Miller responded

to these objections with further arguments in support of his proposed intervention.  *See* Miller's Resp. to Objection as Third Party Pl. ("Miller Resp.") (Doc. No. 60).  The Court granted Miller's Motion in part.  *See* Miller Order.  Pursuant to that Order, Miller filed his Supplement, and Compass Bank filed a Response under the terms of the Miller Order.  *See* Compass Bank's Resp. to the Court's Order Regarding Intervention ("Compass Bank Interv. Resp.") (Doc. No. 71).

In summary, Compass Bank has asked for the Court's permission to foreclose upon the Disputed Assets – two pieces of collateral that they hold in connection with the defaulted State National loan to SamCorp.  City Bank opposes this foreclosure and contends that some or all of that loan collateral should be returned to the bankruptcy estate of SamCorp or the Sambranos.  Miller, the bankruptcy trustee, has been allowed to intervene in this connection.  City Bank has also counterclaimed against Compass Bank for conversion, arguing that a third item – the million dollar payment from the City of El Paso to SamCorp – was tortiously converted by Compass Bank.  City Bank also contends that this million dollar payment can be recovered on a theory of fraudulent transfer.  City Bank 12(b)(1) Resp. 6.  It makes an additional, general claim for tortious interference with a contract.  City Bank has tried to introduce additional theories of liability against Compass Bank by moving to amend its Complaint.  Those additional claims also constitute the EP-10-CV-62-KC  lawsuit which was recently removed from state court.

## II.   MILLER'S INTERVENTION AND THE REFERRAL OF CERTAIN ISSUES TO THE BANKRUPTCY COURT

The Court has previously held that Miller, as Bankruptcy Trustee, may intervene in the instant case in connection with the fraudulent transfer claims because recovery of the Disputed Assets plausibly would be for the benefit of the relevant bankruptcy estates and their general creditors.  *See* Miller Order 12.  Accordingly, the Court also found that Miller's intervention

should lead to the referral of certain claims to bankruptcy court.  *Id.*  The Court observed, though, that Miller had not adequately complied with Rule 24(c), which requires intervenors to place before the Court a copy of their proposed pleadings, so that the exact nature of the intervention sought can be assessed.  *See id.; see also* FED. R. CIV. P. 24(c).  In response to the Court's admonition on this subject, Miller filed his Supplement which set forth his proposed pleadings.  Having reviewed the Miller Pleadings, the Court is satisfied that the proposed intervention is indeed proper for the reasons discussed in the Miller Order.

In this connection, Compass Bank has urged the Court to refer "all claims in the nature of fraudulent transfer to the bankruptcy court if the Court chooses to refer any."  Compass Bank Interv. Resp. ¶ 1.  Compass Bank fears that City Bank will try to use fraudulent transfer theories to "avoid the security agreement and other documents signed in September of 2007 by SamCorp," in order to invalidate the liens granted by SamCorp in favor of Compass Bank, and that anything less than a full referral could lead to inconsistent rulings.  *Id.* ¶ 2.  The Court finds that all the different parts of the fraudulent transfer issue, including all the different assets and amounts claimed under that theory, to be significantly interrelated.  This is because one key aspect of the fraudulent transfer theory affects all parts of the State National loan transactions; that is, the contention that the entire transaction constituted a fraudulent transfer, and that the promissary note, security interests and other loan documents should be set aside.  *See* Miller Pleadings I ¶¶ 27-32; *see also Home Equity Access, L.C.A. v. Sommers*, No. Civ. A. 05-1098, 03-4100, 2006 WL 213946, at *1-3 (S.D. Tex. Jan. 24, 2006) (holding that a lien arising from home equity loan could be set aside when the lender had constructive notice of facts which made the loan transaction a clear attempt to hinder the rights of earlier creditors).  Accordingly, the Court deems all claims sounding in the theory of fraudulent transfer to be included in the instant

referral to bankruptcy court, along with any other theories that appear on the face of the Miller Pleadings.

### III.     COMPASS BANK'S 12(b)(1) MOTION

#### A.     Introduction

The Court now considers the Compass Bank 12(b)(1) Motion.  Compass Bank seeks to establish that, in light of the ongoing bankruptcy proceedings, City Bank lacks standing pursue the fraudulent transfer claims discussed above and thus those claims should be dismissed.  *See* Compass Bank 12(b)(1) Mot. ¶ 6.  The exact claims that Compass Bank argues that City Bank can no longer bring are discussed in turn.  City Bank, as it opposes Compass Bank's plan to foreclose on the Disputed Assets, first asserts the broad contention that the loan transaction documents of September 2007 should be set aside.  *See* City Bank Compl. ¶ 29.  It then argues that the actions taken by the Sambranos in 2008 in relation to some of the Disputed Assets, after the loan defaults were called, constituted fraudulent transfers under the Texas Uniform Fraudulent Transfers Act ("TUFTA").  City Bank S.J. Resp. 7-8.

City Bank also contends that $330,000 of the disputed brokerage account assets had previously – in 2002 – been assigned to SamCorp, and could thus not properly be pledged by any Sambrano family in an individual capacity as collateral for a loan.  *Id.* at 5-7.  Instead, according to City Bank, those assets should still be regarded as the property of SamCorp and thus part of its general bankruptcy estate.  *Id*.  Moreover, City Bank asserts, in a related vein, that because Adelina Sambrano, the wife of the late Humberto Sambrano, did not actually succeed to all of the Disputed Assets by operation of the joint tenancy with right of survivorship rule, she did not effectively create valid security interests as an inheritor or executrix.  City Bank Compl. ¶ 24.

Lastly, City Bank contends that the fraudulent transfer theory also applies to the million

dollar payment from the City of El Paso to SamCorp.  City Bank 12(b)(1) Resp. 6-7.  This

payment, as noted above, was deposited in the SamCorp operating account at Compass Bank,

used to pay down the State National line of credit, later re-advanced from that line of credit to

the operating account, and then apparently spent in the course of business.  City Bank contends

that it has a lien over that money, as it is the proceeds of a SamCorp account receivable – such

accounts receivable having been pledged to City Bank in 2005 in support of its loan.  *Id.*  By

virtue of their relationship to the fraudulent transfer theory, all of these claims are included in the

referral to bankruptcy court discussed above.

### B.      Discussion

Compass Bank prevails on the contention that City Bank does not have standing to bring

these claims, at least with regard to the Disputed Assets.  Even if such claims are filed before

bankruptcy proceedings are initiated, if the transferor later enters bankruptcy any such private

fraudulent transfer claims are cut off or suspended.  *See In re MortgageAmerica Corp.*, 714 F.2d

1266, 1275-76 (5th Cir. 1983).  The bankruptcy trustee must assume all such claims, especially

if the result of the claim would be the unwinding of a transfer and the return of the property to

the bankrupt estate.  *Id.*  In the instant case, City Bank's arguments, outlined above, would result

in the Disputed Assets being returned to the general bankruptcy estate, because City Bank does

not claim to have a security interest in them.  Thus, despite the fact that City Bank initiated its

TUFTA claims before SamCorp and the Sambranos were placed into bankruptcy, they cannot

now press this claim.  Instead, the claim is in Miller's hands.  *See In re Seven Seas Petrol., Inc.*,

522 F.3d 575, 589 (5th Cir. 2008).

City Bank, in response, argues that it has derivative standing to bring this claim because

the bankruptcy court and bankruptcy trustee have consented to its bringing this claim.  City Bank

12(b)(1) Resp. 5.  To support this proposition, it cites a recent Eighth Circuit case as persuasive precedent.  *See id.* (citing *PW Enter. Inc. v. N.D. Racing Comm'n (In re Racing Servs., Inc.)*, 540 F.3d 892 (8th Cir. 2008)).  But that case fails to help City Bank.  In *Racing Services*, the Eighth Circuit held that a creditor could obtain derivative standing to bring fraudulent transfer claims, that seek recoveries for the estate at large, in two broad categories of cases.  540 F.3d at 904-05. The first category is when the bankruptcy trustee unjustifiably refuses to bring a fraudulent transfer claim.  *Id*. at 900.  The details of this category are not relevant here because the trustee has been permitted to intervene in this case to press such claims.  The second category is when the bankruptcy trustee consents to the private creditor's bringing the action, in which case, the court must additionally find:  (a) that the proposed suit is in the best interests of the bankruptcy estate; and (b) it is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings.  *Id*. at 902.  City Bank, however, cites no particular pieces of evidence which support those specific findings necessary to confer standing under the *Racing Services* standard. Thus, that holding does not sustain derivative standing in the instant case.

City Bank also cites *Louisiana World Exposition v. Federal Insurance Co.*, 858 F.2d 233 (5th Cir. 1988), to support the idea that derivative standing is available under Fifth Circuit precedent.  City Bank 12(b)(1) Resp. 5.  However, that case involved a debtor-in-possession (functionally equivalent to a trustee for present purposes) who was unable or unwilling to pursue the claim in question; it did not involve a situation in which the trustee or trustee-equivalent simply granted consent.  *See id.* at 252-53.  In *Louisiana World*, the Fifth Circuit essentially analyzed the first category of cases discussed in *Racing Services*; that is, cases where the trustee or trustee-equivalent unjustifiably failed to press the relevant claims.  The Fifth Circuit simply did not consider the second category, simple consent, which is the category relevant to the

instant case.  Thus, it does not support standing in a Chapter 7 bankruptcy case where the trustee has expressed a willingness to litigate the fraudulent transfer claim, but has also indicated consent for a creditor to litigate the same.  The basic holding of *MortgageAmerica*, which supports stripping creditors of standing to bring such suits in most instances, remains undisturbed under the facts of the instant case.  In summary, while the Fifth Circuit has recognized a doctrine of derivative standing which is available in certain circumstances, there is no reason to believe that those circumstances include the present facts.  Accordingly, Compass Bank prevails on the issue of standing as to the fraudulent transfer claims for the Disputed Assets; City Bank cannot bring them.

The fraudulent transfer theory, as applied to the $1,000,000 payment, though, does not necessarily suffer from this problem.  If City Bank prevails on that claim, the proceeds would not go to the estate but would flow directly to City Bank because of its prior lien over accounts receivable.  *See* City Bank 12(b)(1) Resp. 7.  The *MortgageAmerica* holding made much of the fact that an ordinary fraudulent transfer claim causes "any property recovered [to be] returned to the estate for the eventual benefit of *all* creditors."  *MortgageAmerica*, 714 F.2d at 1275 (emphasis in original) (internal citations and quotation marks omitted).  This justifies the view that the claim essentially belongs to the bankruptcy estate and should be litigated by the estate's representative.  *Id.*  But, because that would arguably not happen in the case of the million dollar payment at issue here, City Bank plausibly distinguishes these facts from the holding in *MortgageAmerica*, and has standing to proceed with this claim.

## C.    Dismissal Granted In Part

Compass Bank has attacked City Bank's standing to bring some of the claims that City Banks asserts in its pleadings.  In light of the considerations discussed above, the Court finds

-16-

that City Bank does not have standing to sue to recover the Disputed Assets under a theory of fraudulent transfer.  Instead, the bankruptcy trustee must press these claims, which this Order refers to bankruptcy court.  Accordingly, City Bank's claims to these assets are dismissed in favor of the trustee's assertion of these claims in bankruptcy court.

However, the Court finds that City Bank does not lack standing to pursue the fraudulent transfer claims it asserts regarding the one million dollar payment, because, if it prevails on this claim, the money would not be returned to the bankruptcy estate for the benefit of all the general creditors.  But, because deciding the fraudulent transfer claim as to the million dollar payment would likely decide issues – such as the underlying enforceability of the September 2007 loan documents – which could affect the bankruptcy estate broadly, this Court will not proceed to consider this claim further; instead, this claim is deemed to be one of claims referred to the bankruptcy court.  *See In re Canion*, 196 F.3d 579, 586-87 (5th Cir. 1999) (holding that a district court may refer to bankruptcy court a claim between two non-debtors that produces an effect on a bankruptcy estate, under a theory termed "related to" jurisdiction).  While City Bank has standing to pursue this claim on its own account, it must do so in bankruptcy court, where all arguments concerning fraudulent transfers will be heard.

Accordingly, the Compass Bank 12(b)(1) Motion is granted in part, to the extent of dismissing, for lack of standing, City Bank's fraudulent transfer claims over the Disputed Assets. It is denied in part, to the extent that the Court does not dismiss any of City Bank's remaining claims on the theory that it lacks standing to bring them.

## IV.    COMPASS BANK'S MOTION FOR SUMMARY JUDGMENT

The Court next considers Compass Bank's Motion for Summary Judgment.  The Court finds that two issues raised in that motion are ripe for summary judgment adjudication at this

time; namely, City Bank's conversion claim against Compass Bank, and City Bank's claim against Compass Bank for tortious interference with a contract. As noted above, the Court will not consider any claims sounding in fraudulent transfer for summary judgment adjudication because they have all been referred to the bankruptcy court.

### A.     Standard

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006). The substantive law identifies which facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Ellison*, 85 F.3d at 189.

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996). If the moving party meets its initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The nonmovant's burden may not be satisfied by "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Warfield*, 436 F.3d at 557 (quoting *Freeman v. Texas Dep't of Crim. Justice*, 369 F.3d 854, 860 (5th Cir. 2004)). Factual controversies are to be resolved in favor of the

nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  "Inferences drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing" summary judgment.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (ellipses in original).  Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

### B.    City Bank's Conversion Claim

City Bank complains that Compass Bank accepted for deposit a check from the City of El Paso payable to SamCorp – the million dollar payment – credited the funds to SamCorp's operating account, and, shortly thereafter, debited that account for $1,000,000 in order to pay down the State National line of credit. City Bank Compl. ¶ 26.  After accelerating SamCorp's loan, City Bank demanded that Compass Bank turn over the $1,000,000, as proceeds from an account receivable over which City Bank had a prior perfected lien.  *Id.* ¶ 27.  Compass Bank paid no money to City Bank in response to that demand, and City Bank now contends that Compass Bank converted the collateral.  *Id.*

### 1.    Second element of conversion not satisfied

Secured lenders may bring an action for common law conversion against recipients of collateral when the transfer or retention was not authorized by the lender.  *Montgomery v. Fuquay-Mouser, Inc.*, 567 S.W.2d 268, 279 (Tex. Ct. App. 1978).   The elements of conversion under Texas law are:

(1) the plaintiff owned, had legal possession of, or was entitled to possession of

the property; (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights; and (3) the defendant refused the plaintiff's demand for the return of the property.

*Huffmeyer v. Mann*, 49 S.W. 3d 554, 558 (Tex. Ct. App. 2001).

The Court assumes, arguendo, that City Bank was entitled to possess the receivables, as it had a lien over the receivables and the loan was technically in default at all relevant points in time. This can be assumed, for the sake of argument, even if City Bank had not yet recognized or called the default at the time the check was deposited or the line of credit paid down. It is also undisputed that Compass Bank refused to turn over $1,000,000 to City Bank once it was asked. Thus, the first and third elements of conversion are satisfied by City Bank.

But the second element is not. At no point did Compass Bank exercise dominion over the million dollars, in an unauthorized or unlawful manner, inconsistent with City Bank's rights to these funds. This is because Compass Bank took possession of the proceeds lawfully, and later lawfully transferred these proceeds back to SamCorp before City Bank demanded its collateral. During the entire period that Compass Bank held these proceeds in the form of a credit against the State National loan, City Bank had consented to SamCorp's custody and use of the funds, and SamCorp had in turn consented to Compass Bank's holding of the funds. By the time City Bank asserted its authority to take possession of the money and deny SamCorp the right to use and dispose of it, Compass Bank was no longer holding it as a credit against the State National loan. Moreover, certain statutes provide Compass Bank with additional protection under the circumstances of this case.

The problems with the second element begin with the fact that SamCorp had City Bank's consent to collect and dispose of receivables in the ordinary course of business. Consent defeats a claim for conversion, by rendering the actions of the actor authorized, negating the second

-20-

element of that tort.  *See Rente Co. v. Truckers Exp., Inc.*, 116 S.W.3d 326, 333 (Tex. Ct. App. 2003).  From the inception of the loan relationship in this case, City Bank consented to SamCorp's ability to use and control accounts-receivable proceeds, instead of demanding that they be collected through a "lock box account," and City Bank did not attempt to revoke its consent until after the events concerning the deposit of the million dollar payment had fully played out.  *See* Charles L. Williams Dep. 59:22-61:4, Dec. 29, 2009 ("Williams Dep.") (Doc. No. 51-21) ("A.  . . .  In some accounts receivable lines of credit, all of the accounts receivable proceeds flow into a lock box account.  Those monies then are automatically applied as a payment on the note . . . when a company needs working capital to pay expenses, et cetera, an advance would be made on the line of credit. . . . Q. [D]o you find where City Bank used that system to protect its accounts receivable at all?  A.  I did not find that."); *see also* Rush Dep. 85:4-86:18 ("A.  Another method [for a bank to control the disposition of collateral proceeds] is when you – you could have all the payments come directly to [the bank] . . . we did that going forward [after the default was recognized].").  When a borrower has the consent of the secured lender to retain possession of the collateral and voluntarily places it in the custody of another party, a claim for conversion by the secured lender against that third party arises only once such lender consent is validly revoked in a communication directed at that third party.  *See First State Bank of Odessa, N.A. v. Arsiaga*, 804 S.W.2d 343, 344 (Tex. Ct. App. 1991).[7]

---

[7]         In this case, a bank was seeking to repossess a pickup truck after the borrower defaulted on an auto loan.  The truck had been left with a mechanic for repairs, but no payment was made to the mechanic.  The court held that the mechanic's lien was superior to the bank's security interest, and observed, in passing, that the bank's (ultimately unsuccessful) claim for conversion against the mechanic arose only after "the [b]ank, in writing, demanded that [the mechanic] surrender the truck." 804 S.W.2d at 344.

City Bank's contention that SamCorp did not have the power to deposit the million dollar payment in its Compass Bank operating account, because SamCorp was in default by reason of being in violation of the loan covenants against additional borrowing, is simply incorrect. Secured lenders with liens on intangibles, such as the accounts receivable of a business, may use self-help to liquidate such collateral after default by, inter alia, notifying the customer to pay the lender instead of the business, taking any proceeds of collateral, or enforcing the rights of the business against those who owe it money.  TEX. BUS. & COMM. CODE § 9.607(a).[8]  But, the statute never speaks in terms of transferring "ownership" or exclusive rights of control over the collateral to the secured lender automatically upon the happening of default, a result City Bank claims here.[9]  The lender merely has the right to move to take possession of the proceeds, if it can, and it may assert the borrower's rights against the borrower's debtors in order to attempt to collect receivables.  *Id.*  The fundamental rule, which remains unchanged, is that a lienholder entitled to proceed against collateral due to borrower default is not the "owner" of the collateral. *See Comercia Acceptance Corp. v. Dallas Cent. Appraisal Dist.*, 52 S.W.3d 495, 497 (Tex. Ct. App. 2001) ("A lienholder is not an 'owner' of the property within the common meaning of that

---

[8]        The first nine chapters of the Texas Business & Commerce Code represent the Texas codification of the Uniform Commercial Code ("UCC").  Citations to the comments to any particular code provision are to the Official Comments published by the drafters of the UCC.  Texas courts regard these comments as "persuasive authority for interpreting statutory language."  *Carter v. Cookie Coleman Cattle Co.*, 271 S.W.3d 856, 860 n.7 (Tex. Ct. App. 2008).

[9]        "SamCorp defaulted first on September 15, 2007, when it opened the line of credit with SNB in violation of the City Bank loan documents.  As of that date, City Bank had the immediate right of possession of all accounts receivable of SamCorp, including the $1 million from the City of El Paso.  SamCorp had no right to deposit the check with Compass, and Compass had no right to apply the funds to their line of credit."  City Bank S.J. Resp. 1.

term."). The fact that events of default had actually transpired give City Bank the right to take action, but it does not *automatically* transfer ownership, revoke consent, or strip SamCorp of its power to deal with property. *See* City Bank Commercial Security Agreement 2 (Doc. 51-26 Ex. 22) (stating, in the "REMEDIES" section, that upon borrower's default City Bank may accelerate the loan, require borrower to gather collateral and make it available, enter borrower's premises to collect collateral and use any other remedy provided by law, but not purporting to revoke automatically any or all of borrower's rights or powers to retain or use collateral which the bank has not taken steps to repossess).

The events surrounding the deposit of the check, its application towards the State National line of credit, and the re-advancement of the funds into the operating account from that line of credit all took place at the end of December 2007 and the first half of January 2008. *See* Tynan Dep. 203:18-205:16. It was only later, on January 30, 2008, that City Bank, having called default, revoked its consent for SamCorp to make use of these proceeds when it sent a letter to Compass Bank to that effect. City Bank Compl. ¶ 20. As noted before, consent defeats a claim for conversion, and the evidence before the Court shows that there was consent until January 30, 2008. *See Rente Co.*, 116 S.W.3d at 333.[10] Thus, SamCorp's use of the City of El Paso payment

---

[10]    The type of consent at issue here may, but need not, be the type of lien-stripping consent described in *Fuquay-Mouser*, which allows the transferee permanently to keep the collateral free of a security interest even after the lender revokes consent and seeks return of the collateral. *See Fuquay-Mouser*, 567 S.W.2d at 270. There is evidence that City Bank allowed SamCorp to collect and spend receivables in the ordinary course, without concern that these items of collateral were being dissipated, because new receivables, subject to the security interest, were constantly entering the "inventory" of loan collateral. *See* Rush Dep. 94:14-95:8. For present purposes, the Court finds it sufficient to establish that SamCorp had ordinary consent to deal with the receivables, akin to the consent that the borrower had to use the pickup truck on a day-to-day basis in *First State Bank of Odessa*,

in late December 2007 and early January 2008 was done with City Bank's as-yet-unrevoked consent, and Compass Bank's actions were taken with the consent of SamCorp. This defeats a claim for conversion to the extent the proceeds were handled and retained by Compass Bank before January 30, 2008.

Compass Bank is protected beyond that date because, by then, it was no longer holding the one million dollar payment as a credit against the State National line of credit. Instead, as noted above, it had returned it to SamCorp, by depositing it in SamCorp's operating account. Moreover, Compass Bank's handling of that account is protected by Texas Business and Commerce Code § 9.341, whose terms are discussed below. Accordingly, the Court now turns to the statutes which modify the common law rules in the banking context.

### 2.      Statutory protection for deposit-taking banks

Texas law explicitly protects deposit-taking banks, such as Compass Bank, against various common law claims that might otherwise arise as a result of ordinary banking operations. This negates the second element of conversion by making certain bank actions, which exercise dominion and control over property, not "unlawful."[11]   *See Huffmeyer*, 49 S.W.3d at 558. Three particular statutes are relevant here, as discussed below.

### a.      Texas Business & Commerce Code § 9.341

which did not call into question the bank's ultimate security interest in the truck. *See First State Bank of Odessa* 804 S.W.2d at 344-45. While *Fuquay-Mouser* consent would defeat a conversion claim over permanent retention of the collateral, ordinary consent defeats a conversion claim only for the period in which the consent was outstanding, which is sufficient for present purposes.

[11]      The statutes might also serve to defeat the first element of conversion – that the plaintiff had ownership or rights of possession over the property – by setting up superior rights of ownership or possession in the protected bank.

Texas law protects deposit-taking banks from interference by an account holder's secured lender, so that day-to-day banking operations can proceed without legal uncertainty.  Unless a bank

> otherwise agrees in an authenticated record, a bank's rights and duties with respect to a deposit account maintained with the bank are not terminated, suspended, or modified by:
>
> > (1) the creation, attachment, or perfection of a security interest in the deposit account;
> >
> > (2) the bank's knowledge of the security interest; or
> >
> > (3) the bank's receipt of instructions from the secured party.

TEX. BUS. & COMM. CODE § 9.341.

This protective principle specifically applies in cases where a secured lender is, in the wake of default, pursuing accounts receivable over which it has a perfected lien and finds that their proceeds have been deposited in a bank account.  *See* TEX. BUS. & COMM. CODE § 9.607 cmt. 7 ("[If] a security interest in a deposit account . . . is perfected . . . by virtue of the proceeds rules . . . the depository institution ordinarily owes no obligation to obey the secured party's instructions. . . . To reach the funds without the debtor's cooperation, the secured party must use an available judicial procedure.").  Thus, while a secured lender may use self-help to collect receivables from the borrower's customers, it is not able to commandeer a borrower's bank account without judicial process.  The bank holding the deposit account need only listen to the requests of its customer; it is protected from the demands of the lender until a court intervenes.

When Compass Bank accepted the million dollar payment for deposit into SamCorp's operating account, obeyed its customer's instructions to apply those proceeds to the State National line of credit, then re-deposited the money in the operating account after SamCorp's request to re-draw on the line of credit, Compass Bank did not exercise dominion and control

-25-

over that property in a manner unauthorized by law.  Rather, under state law, not only was

Compass Bank authorized to execute transactions on the deposit account according to

SamCorp's instructions, it was *obligated* to do so, even if it had received contrary instructions

from City Bank.  *See id.* § 9.341.  Moreover, as noted above, Compass Bank did not receive such

contrary instructions until after the aforementioned deposit, draw-down, and re-advance had

already taken place.  It is not clear, though, if this statutory protection extends to times in which

the proceeds are applied as credit against an outstanding line of credit, instead of simply resting

in a deposit account, as the statute specifically speaks in terms of a "deposit account."  *Id.*  Thus,

the statute may only provide a shield to Compass Bank for the period when the proceeds were in

the deposit account, but not for the period in which the proceeds were applied towards the line of

credit.  Nevertheless, on the facts of this case, the factor of consent, discussed above, protects

Compass Bank during that period, even if the statute does not.

### b. Texas Business and Commerce Code § 9.332

Compass Bank argues that the payment against the State National loan balance is also

privileged by § 9.332 of the Texas Business and Commerce Code as a transfer from a deposit

account, which frees it from any liens that had subsisted in the property to that point.  *See*

Compass Bank S.J. Mot. ¶ 11 (citing TEX. BUS. & COMM. CODE § 9.332); *see also* TEX. BUS. &

COMM. CODE § 9.332(b) ("A transferee of funds from a deposit account takes the funds free of a

security interest in the deposit account unless the transferee acts in collusion with the debtor in

violating the rights of the secured party.").  City Bank responds by arguing that Compass Bank

fails the collusion test in § 9.332, or, that in the alternative, the lien-stripping provisions of

§ 9.332 only apply to liens filed against the deposit account itself, and not to liens that attach to

money in a deposit account by virtue of the fact that the money is proceeds from accounts

receivable which are subject to a perfected lien.  City Bank S.J. Resp. 4 (citing *Madisonville State Bank v. Caterbury*, 209 S.W.3d 254, 258 (Tex. Ct. App. 2006)).  These arguments are unavailing.

First, there is no evidence that Compass Bank actually colluded with any SamCorp representatives to violate the rights of City Bank, notwithstanding City Bank's strenuous, but bald, averments to the contrary.  *See* City Bank S.J. Resp. 4.  The definition of "collusion" under § 9.332 is defined with reference to that term's usage in Article 8 of the UCC.  *See* TEX. BUS. & COMM. CODE § 9.332 cmt. 4.  Comment 5 to Texas Business and Commerce Code § 8.115 states that the "collusion test is intended to adopt a standard akin to the tort rules that determine whether a person is liable as an aider or abettor for the tortious conduct of a third party" and makes reference to the Restatement (Second) of Torts § 876.  TEX. BUS. & COMM. CODE § 8.115 cmt. 5.  The Restatement speaks about doing a tortious act "in concert" with, or knowingly rendering "substantial assistance or encouragement" to, the tortfeasor.  *See* Restatement (Second) of Torts § 876.

At first glance, the fact that Compass Bank accepted a large payment against the State National line of credit, a little more than two weeks before SamCorp was placed into default and had its loans called, seems to imply concert of action, with Compass Bank purposefully obtaining protection against SamCorp's impending insolvency shortly before the insolvency took place.  *See* Rush Dep. 13:23-14:11 (stating that SamCorp's default was detected and called between January 16 and January 18, 2008); *see also* City Bank Compl. ¶¶ 26, 28 (averring that the million dollar payment was deposited and credited to the State National line of credit at the end of December 2007).  However, this implication of collusion is largely undercut by the fact that Compass Bank did not actually retain this payment against the State National line of credit,

but instead returned the money to SamCorp mere days before the default was detected and called. *See* Tynan Dep. 203:18-205:16, 217:6-218:5 (stating that $1,000,000 was re-advanced during the first half of January 2008). The record suggests that the only motivation for this transaction was SamCorp's desire to present its books in a favorable light, at the end of an accounting period, to its bonding company. Tynan Dep. 217:6-218:5. Because the money was quickly returned to SamCorp's operating account after the new year had passed, concerted action, or substantial assistance in a plan to defeat the rights of City Bank, is not apparent in these transactions. Compass Bank effectively unwound the payment against the State National loan and increased its credit exposure to SamCorp just before SamCorp firm imploded, which appears to be the opposite of collusive behavior. Thus, the "collusion" exception to § 9.332 does not apply here.

Second, City Bank argues that the holding in *Madisonville State Bank* precludes the application of § 9.332 to this case, notwithstanding the result of any collusion test. City Bank S.J. Resp. 4. Indeed, that case squarely addresses the circumstance in which there is a lien against a set of accounts receivable, the proceeds of a receivable are deposited into a bank account, a payment is made from that bank account, and the secured lender seeks to enforce its lien against the funds while they are in the hands of the payee. *Madisonville State Bank*, 209 S.W.3d at 258. The court in *Madisonville State Bank* did not apply the lien-stripping provisions of § 9.332 to such a case, holding only that they applied to a case where the lien was initially filed over the bank account itself. *Id.* This would suggest that the lien-stripping provisions would not operate in the instant case, which also involves encumbered proceeds of accounts receivable deposited into a bank account, and not a direct lien over a bank account.

But the *Madisonville State Bank* holding appears to be unsound. Comment 3 to §9.332

specifically defines encumbered accounts as being not only those subject to a direct security interest filed over the account itself, but also "deposit accounts containing collections from accounts receivable." TEX. BUS. & COMM. CODE § 9.332 cmt. 3. That is, the origin of the security interest over the funds in the account is immaterial – accounts with liens filed on them directly and unencumbered accounts which receive encumbered proceeds are both covered by § 9.332. *Id.* Faced with such an explicit statement of legislative intent, which the court in *Madisonville State Bank* failed to address, the Court does not rest its decision on *Madisonville State Bank*, and concludes that SamCorp's operating account at Compass Bank, and the City of El Paso proceeds deposited therein, are both within the ambit of § 9.332. *See also Keybank, N.A. v. Ruiz Food Prods., Inc.*, No. 04-CV-296-MHW, 2005 WL 2218441, at *4-7 (D. Idaho, Sept. 9, 2005) (interpreting the Idaho version of the statute, identical in all material respects to the Texas version, to include accounts containing encumbered receivables proceeds, and stating additional policy reasons to favor the broad reading of this statute).

However, it is not clear that a bank which both maintains deposit accounts on behalf of a customer and extends loans to that customer is properly regarded as a protected "transferee" when it applies deposit account funds to pay down outstanding loan balances. *See* TEX. BUS. & COMM. CODE § 9.332 cmt.1 ("[T]his section does not cover . . . the case in which a bank debits an encumbered account and credits another account it maintains for the debtor."). While this text might be taken to mean simply that the bank's customer cannot escape liens by transferring money between one account and another at the same bank, this text could also serve to exclude from the statute's protection a bank which applies deposit account funds towards outstanding loans owed by the same customer. *See, e.g., Kentucky Highlands Inv. Corp. v. Bank of Corbin, Inc.*, 217 S.W.3d 851, 857 (Ky. Ct. App. 2006) (applying the Kentucky version of the UCC and

holding that a bank which held both deposit accounts and loans for a customer was not a protected transferee when, on customer instructions, it used funds from the deposit accounts to pay down the loans).  Because both readings are plausible, and because there are adequate alternative grounds to decide the overall issue of conversion, the Court declines to decide this uncertain point of state law.

### c.  Texas Business and Commerce Code § 9.327

Compass Bank offers an additional set of statutory grounds to shield it from City Bank's demands; namely, § 9.327 of the Texas Business and Commerce Code.  That statute reads, in pertinent part:

> Except as otherwise provided in paragraph (4), a security interest held by the bank with which the deposit account is maintained has priority over a conflicting security interest held by another secured party.

TEX. BUS. & COMM. CODE § 9.327(3).

Compass Bank claims that this statutory provision serves to give them priority over accounts receivable proceeds when they are deposited in a Compass Bank account, even though City Bank might have obtained a security interest in those proceeds at an earlier point in time and properly perfected that interest by filing it with the state.  *See* Compass Bank S.J. Mot. ¶¶ 9-10.  City Bank responds by arguing that § 9.327(3) only applies when both secured parties are claiming a security interest over the account itself and does not override the priority of a secured party who takes a lien over intangibles and then follows the proceeds into a bank account.  *See* City Bank S.J. Resp. 4.  This is a transparent mis-reading of the law.[12]

---

[12]    This incorrect understanding is shared by City Bank's retained expert, Mr. Charles L. Williams ("Williams"), who admitted to not taking § 9.327 into consideration when formulating his conclusions on this subject.  *See* Williams Dep. 50:20-51:20, 53:6-56:9.  He couches his conclusions in terms of industry practice, though, and not in terms of law.  *Id.*  Accordingly, the

City Bank cites to comment 2 of § 9.327 in an attempt to support its argument. *Id.* It reads the sentence "this section contains the rules governing the priority of conflicting security interests in deposit accounts" as meaning that the section only covers security interests created by a direct claim over the account itself, and not security interests in an account that arise because encumbered proceeds are deposited into an otherwise-unencumbered account. *Id.* But, in making this claim, City Bank ignores the rest of the official commentary, which explicitly refutes this reading of the text. Comment 4 states: "Under paragraph (3), the security interest of the bank with which the deposit account is maintained normally takes priority over all other conflicting security interests in the deposit account, regardless of whether the deposit account constitutes the competing secured party's original collateral *or its proceeds*." TEX. BUS. & COMM. CODE § 9.327 cmt. 4 (emphasis added). The commentary goes on to warn that a

> secured party who claims the deposit account as proceeds of other collateral can reduce the risk of becoming a junior by obtaining the debtor's agreement to deposit proceeds into a specific cash-collateral account and obtaining the agreement of that bank to subordinate all its claims to those of the secured party. But if the debtor violates its agreement and deposits funds into a deposit account other than the cash-collateral account, the secured party risks being subordinated.

*Id.*

City Bank argues that it "does not claim to have a security interest in the deposit account," but that it has "a perfected security interest in the $1 million as proceeds of accounts receivable" making "[§] 9.327 inapplicable to this case." City Bank S.J. Resp. 4. But this flatly contradicts the text of Comment 4, and is thus unconvincing.

City Bank also contends that Compass Bank does not have a security interest (even a junior one) over the operating account, which § 9.327 could bootstrap into senior position. *Id.* at

---

Court holds no opinion as to what is common practice in the banking industry, which by voluntary custom may differ from the rights and options available under the law.

2. This argument functions on two levels.  First, if the September 2007 loan documents are set aside, then any security interest purportedly created in them would effectively not exist, and thus could not be moved into senior position by the statute.  Second, City Bank disputes the meaning of the loan documents themselves, in the event they are deemed effective, arguing that their language does not serve to create the required junior security interest in favor of Compass Bank, which could then be moved into senior position by the statute.  *Id.*  The question of whether the loan documents are to be set aside is bound up with the question of fraudulent transfer, and has thus been referred to the bankruptcy court.  This Court therefore declines to decide this particular question until the bankruptcy court has made its findings.

But the question of whether the loan documents – assuming they are effective – create a junior security interest in favor of Compass Bank, which could be made senior, is answered in the affirmative.  The documents clearly spell a direct reservation of a security interest in the deposit account, as well as a lien – pushed to second position because of its timing – over the accounts receivable themselves.  *See* State Nat'l Bank Promissory Note ¶¶ 4, 12 (Doc. No. 44-2 at 22-25) (reserving State National Bank's security interest over SamCorp's receivables and SamCorp's deposit accounts held at State National Bank); *see also* Security Agreement (Doc. No. 51-28 Ex. 36) (creating a security interest over SamCorp's accounts receivable in favor of State National Bank).[13]  City Bank argues that this second-position lien on receivables never actually attached, because the City Bank loan agreement prohibited SamCorp from selling or

---

[13]       This bootstrapped security interest is realized, under the law, by executing a set-off between the outstanding loan and the deposit account; competing security interests held by lenders who are not the deposit bank do not affect the bank's right to effect such a set-off.  *See* TEX. BUS. & COMM. CODE § 9.340; *see also* State Nat'l Bank Promissory Note ¶ 12 (creating a contractual right of set-off in favor of Compass Bank).

encumbering the collateral, which stripped SamCorp of the power to grant a security interest. City Bank S.J. Resp. 2.  But this argument is also unavailing.  The contractual language does not explicitly attempt to disable SamCorp's power in these matters, but is phrased in the form of a promise: "Debtor will not sell [or encumber] . . . ."  City Bank Commercial Security Agreement 2.  While SamCorp's grant to Compass Bank of a junior security interest might have constituted another violation of the loan agreement, the company itself did not lack the power to make it.[14] The permissibility of SamCorp's granting the junior security interest appears to be part of the fraudulent transfer analysis, though, so the Court will express no opinion on this question here.

Thus, whether City Bank has indeed been made junior to Compass Bank with respect to its security interests in any accounts receivable proceeds deposited in a Compass Bank account (on a theory that § 9.327 moved Compass Bank's lien into senior position) depends on whether the liens created by the 2007 loan documents are deemed to be valid.  Because that issue is, in part, bound up with the fraudulent transfer claims being transferred to bankruptcy court, this Court will not address this question now.  If these junior liens are deemed to be valid, then Compass Bank would be protected from a claim of conversion (even if it had kept the proceeds as a permanent credit against the State National loan) because its liens would be bootstrapped into senior position.

---

[14]     The analogy to the law concerning restraints on alienation in real property is instructive.  Texas courts recognize three classic types of restraints on alienation: 1) disabling restraints, 2) promissory restraints, 3) forfeiture restraints.  *Sonny Arnold, Inc. v. Sentry Sav. Ass'n*, 633 S.W.2d 811, 813-14 (Tex. 1982).  While the rules concerning when such restraints are invalid as a matter of public policy differ when the subject is real property instead of personal property, this is still a useful schema for categorizing and interpreting contractual language, and the language in this case is clearly promissory, not disabling.

### 3.   Conclusions regarding conversion

City Bank has made a claim of conversion against Compass Bank, and Compass Bank has moved for summary judgment foreclosing this claim.  The critical issue is whether the second element of the tort of conversion is precluded in this case.  The Court holds that it is. Compass Bank prevails because of the basic definition of the tort, which requires the defendant to exercise "dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights."  *Huffmeyer*, 49 S.W.3d at 558.  City Bank is not complaining of a situation in which Compass Bank realized its security interest by freezing a deposit account with receivables proceeds in it and applying the credit towards the State National loan, over the objections of City Bank, thus preventing the proceeds from being used as credit towards the City Bank loan.  Without explicit statutory protection, that sort of situation could easily be deemed conversion.  Based on the evidence, though, the case does not come down to this question.  Rather, Compass Bank had consent to hold the proceeds until the end of January 2008.  Before City Bank revoked its consent, the credit against the State National loan was returned to SamCorp – mere days after it was first applied to the loan – and Compass Bank kept nothing.  Compass Bank does not need to justify the retention of encumbered receivables proceeds when it did not actually retain any receivables proceeds.

The Court holds that if City Bank can trace the proceeds into SamCorp's State National loan account, City Bank must also follow those proceeds as they left that loan account, at the beginning of January 2008, and were returned to SamCorp's operating account.  *See* Tynan Dep. 203:18-205:16; *see also Tri-State Chem., Inc. v. W. Organics, Inc.*, 83 S.W.3d 189, 198 (Tex. Ct. App. 2002) (holding that value can be traced through substitute assets when the original assets are sold or exchanged, under a theory of "mutation").  City Bank nowhere alleges that Compass

Bank ever re-took these proceeds as credit against the State National loan after this return of the funds to the operating account. Accordingly, by the time City Bank revoked SamCorp's permission to deal in these proceeds, at the *end* of January 2008, these proceeds were not held by Compass Bank as a credit against the State National loan. They were either in SamCorp's operating account, a situation governed by § 9.341 (protecting Compass Bank against a conversion claim for its ordinary dealings with the account), or they had already been distributed from that account to third parties, whose identities and whereabouts are unknown, and who are likely protected by § 9.332. *See* Tynan Dep. 191:13-192:12, 196:7-20 (showing that advances from the line of credit were typically placed in the operating account for general corporate use).

For the reasons set forth above, the Court concludes that a claim for conversion cannot lie as to the million dollar payment, neither as to when these proceeds were held in SamCorp's operating account, and presumably paid out to third parties from that account, nor as to the temporary period during which it was applied as a credit towards the State National loan. Compass Bank is granted summary judgment on this claim.

### C.    Tortious Interference with a Contract

City Bank has asserted a claim against Compass Bank for tortious interference with a contract. City Bank Compl. ¶ 30. Specifically, it claims that entering into an agreement to create the new State National loan, and failing to pay off the City Bank loan when the new loan was funded, each constituted acts of tortious interference. *Id*. The Court concludes that the mere entering into a new banking relationship was not tortious. As discussed below, refinancing an old loan with a more advantageous one, obtained elsewhere, is a common, accepted, and non-tortious financial practice. However, the manner in which Compass Bank set up and funded the new loan might be tortious, and there is a genuine issue of material fact which precludes

summary judgment on this point.

The elements of tortious interference with contract, under Texas law, are "(1) existence of a contract subject to interference, (2) willful and intentional interference, (3) interference that proximately caused damage, and (4) actual damage or loss." *WTG Gas Processing, L.P. v. ConocoPhillips Co.*, No. 14-08-19-CV, --- S.W.3d ----, 2010 WL 695801, at *15 (Tex. Ct. App., Mar. 2, 2010) (citing *Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998)).  There is no dispute that a contract existed between SamCorp and City Bank.  Compass Bank argues that the elements of intentional interference, proximate cause and actual damages are not met, and that based on the evidence before the Court there is no possibility that they could be met.  *See* Compass Bank S.J. Mot. ¶¶ 17-21.  To prevail on summary judgment, Compass Bank must show that at least one essential element of the claim against it cannot be supported by the evidence on record.  *See Trautmann v. Cogema Min., Inc.*, No 5:04-CV-117, 2006 WL 2716156, at *5 (S.D. Tex. Sept. 20, 2006).

As a threshold matter, while there was a contract between SamCorp and City Bank concerning the revolving line of credit issued in 2005, it is clear that this contract was not subject to tortious interference by way of another bank agreeing with SamCorp to refinance this loan through a new, competing line of credit.  First, the loan agreement between SamCorp and City Bank did not restrict SamCorp's ability to pay off the entire loan in full at any time, though the form on which it was printed contained the option for including such a restriction.  *See* City Bank Commercial Loan Agreement (Doc. No. 51-27 Ex. 19).  Second, it is recognized banking industry practice that customers in these types of loan relationships are free to move their business elsewhere and have new banks refinance loans that are held by the customer's existing bank.  *See* Rush Dep. 51:6-52:25; *see also* Williams Dep. 66:16-69:25.  This is so even if that

-36-

results in the old bank losing future profits that it would have earned had that lending relationship continued. *See* Williams Dep. 66:16-69:25. Accordingly, the Court cannot conclude that the mere intent to enter into a refinancing, and the execution of loan documents to that end, constitutes tortious interference with contract.

However, the contract between SamCorp and City Bank is subject to interference as to the clause that prohibited SamCorp from assuming new indebtedness, in excess of $100,000, while the City Bank loan remained outstanding. *See* City Bank Commercial Loan Agreement; *see also* City Bank Addendum "A" to Loan Agreement ("No additional debt in excess of $100,000 will be incurred by either the borrower or guarantors."). A contract is subject to interference when a third party is in the position to cause or induce one of the parties to the contract to breach it. *See Classic Century, Inc. v. Deer Creek Estates, Inc.*, No. 2-06-104-CV, 2008 WL 3540194, at *7 (Tex. Ct. App., Aug. 14, 2008). The no-new-indebtedness aspect of the contract could be subject to tortious interference by a rival lender, if it induced SamCorp to incur further debt in excess of the limit without properly retiring or re-negotiating the City Bank loan. Thus, the first element of the tort is met, as the City Bank loan contract was a contract subject to interference as to its no-additional-debt clause.

The second element, willful and intentional interference, can be divided into two sub-elements. First, the tortfeasor must have known about the contract whose breach he is inducing, and Texas law assesses this knowledge on a know-or-should-have-known basis. *See Amigo Broad., L.P. v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 490 (5th Cir. 2008). The tortfeasor is liable even if he had no direct knowledge of the contract, but only knew of "facts and circumstances that would lead a reasonable person to believe in the existence of the contract or business relationship." *Id.* As to the second sub-element, the tortfeasor must have done the

interfering act with the intent to damage or induce breach of the existing contract, but this intent

is defined as either (1) the actual desire to bring about the injurious result, or (2) the subjective

belief that "interference was substantially certain to result from [the tortfeasor's] actions." *Sw.*

*Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992).

As to the first sub-element, knowledge that the contract in question existed, Compass

Bank knew, or should have known, that the City Bank loan agreement existed because it knew

the loan itself existed. *See* Owen Dep. 63:4-23. Moreover, it knew or should have known that

the City Bank loan agreement prohibited additional indebtedness, because the documents said so

on their face and also because such restrictions are fairly common industry practice. *See* City

Bank Commercial Loan Agreement; *see also* City Bank Addendum "A" to Loan Agreement; *see*

*also* Tynan Dep. 134:18-135:6. Thus, the Court concludes that, under Texas law, Compass Bank

is deemed to have knowledge of the contract and of the contract terms that are relevant here.

Regarding the second sub-element, given that Compass Bank is deemed to have known

the terms of the City Bank contract, it would have known that placing the loan money in the

operating account, for SamCorp to write a check to City Bank, would lead to at least a brief and

technical default. The State National loan was incurred from the moment the funds were

credited into the operating account, because at that point the funds were simultaneously debited

from the loan account. Meanwhile, the City Bank loan was outstanding for at least another few

hours or days while the wire transfer or check that would pay it off was being processed. *See* S.

Sambrano Dep. 120:20-121:2 ("[Y]ou can't pay one off without the other. There has to be a

time lag. So the moment we draw on one, on the second one, then you're in violation of both

covenants, of both covenants of both banks."). One way to avoid this Catch-22 is to employ a

direct bank-to-bank payment – if a payment is sent directly from the new bank to the old bank,

the new indebtedness will not be incurred until the very moment the old debt is retired by the clearing of the arriving funds, avoiding the default and guaranteeing that the funds are properly applied.  *See* Owen Dep. 128:8-130:2; *see also* Williams Dep. 81:25-82:15.

While direct evidence of subjective intent is thin, the circumstantial evidence cited above suggests that there is a plausible inference that Compass bank had the subjective intent to cause a breach in the SamCorp–City Bank loan agreement.  At a minimum, the intent to cause a minor and temporary breach could be found on the evidence here, as it is undisputed that Tynan structured the transaction so that the two loans were to remain outstanding simultaneously for at least a short period while SamCorp itself paid off the City Bank loan.  Whether Compass Bank had the intent to cause the larger and more harmful results which actually took place here is a more open question, but one which the Court does not have to reach.[15]  Because reasonable

---

[15]      The direct testimony of the Compass Bank and SamCorp officials involved in the State National loan states that they intended the transaction at issue, when commenced, to be an ordinary refinancing – not a fraud on or harm to City Bank. *See* S. Sambrano Dep. 123:6-124:21; *see also* Tynan Dep. 150:7-151:15.  While this direct evidence might be discounted as self-serving, the circumstantial evidence supports this view as well.  City Bank only learned of SamCorp's relationship with Compass Bank – and therefore, about the second outstanding loan – when Tynan himself mentioned to City Bank officials, during a recruiting lunch, that he handled SamCorp's business with Compass Bank.  Rush Dep. 12:2-17; *see also* Owen Dep. 106:10-108:1; *see also* Tynan Dep. 256:8-259:8.  Had he possessed actual knowledge of SamCorp's actions in wrongfully maintaining both lines of credit, and the intent that their scheme should succeed, it seems improbable that he would have agreed to such a meeting with City Bank executives and, at that meeting, disclosed to them information which would quickly lead to the scheme's unraveling.  Accordingly, it is difficult to surmise from the evidence in this case that Compass Bank truly had the original intent to cause the sort of harm to City Bank which, allegedly, was eventually suffered.  The question of whether the intent to cause only a minor breach, which would lead to no apparent harm, is enough to satisfy this element of the tort is a delicate one, and is bound up to some degree with the question of objective foreseeability, which is discussed below.

inferences are to be taken in favor of the party not moving for summary judgment, *Matsushita*, 475 U.S. at 587, and there is enough circumstantial evidence here to allow a jury to infer that there was intent to induce at least some breach of the City Bank loan contract, summary judgment is denied.

The third element is proximate cause. This also includes two sub-elements; namely, cause-in-fact and foreseeability. *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 126 (Tex. Ct. App. 1997). "An act or omission is a cause-in-fact of the alleged harm or injury when it was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Moreno v. Quintana*, No. 08-06-134-CV, --- S.W.3d ----, 2010 WL 797921, at *5 (Tex. Ct. App. Mar. 10, 2010). There can be little doubt that Compass Bank's actions were a cause-in-fact of SamCorp's breach of its loan covenants with City Bank. The covenant in question forbade SamCorp from incurring additional indebtedness of $100,000 or more, and a debt necessarily involves at least two parties – the lender and the borrower. The lender who loans the money to the borrower is a necessary part of consummating a loan transaction – but for the presence of a lender, the borrower could not borrow. Thus, a lender must be a cause-in-fact of a borrower's indebtedness, and accordingly must also be a cause-in-fact of a borrower's breach of any covenant that forbade or restricted future borrowings. *See Moreno*, 2010 WL 797921, at *5. To the extent that damages resulted from that breach of the loan agreement and the simultaneous existence of two lines of credit instead of one, the creation of the second line of credit is a necessary part of such a scenario.

The more difficult question is foreseeability. Addressed above is the point that Compass Bank plausibly had subjective intent to cause at least a minor and transient breach of the City Bank loan agreement. An objective foreseeability test is also satisfied on the facts discussed in

that connection, at least as far as saying that it was objectively foreseeable that a minor breach

was inevitable.  But it is a closer call as to whether, given what is already known about these

transactions, the full scope of what actually took place, and the magnitude of the alleged harm,

was foreseeable under the circumstances.  Certainly, the fact that banks typically avoid

structuring refinancing transactions in the manner in which Compass Bank executed the instant

transaction is suggestive as to what is objectively foreseeable – foreseen and defended against –

in the world of banking.  *See* Williams Dep. 82:24-83:6.  But that sort of specific fact-finding is

too close a call on the evidence here, and is thus inappropriate at the summary judgment stage.

Instead it is a matter for trial.  *See Moreno*, 2010 WL 797921, at *5 (holding that "proximate

cause is generally a fact question" for the jury, unless the "evidence is undisputed" and "only

one reasonable inference" may be drawn from it).[16]  Accordingly, summary judgment is not

available to Compass Bank on the grounds that the evidence adduced so far forecloses a finding

of proximate cause.

      The fourth element is damages.  Compass Bank argues that City Bank has suffered no

---

[16]    Compass Bank also argues, on this point, that it did not proximately cause damages to City Bank because it injected $4,000,000 into SamCorp that could have been used to pay off the City Bank loan.  Compass Bank S.J. Mot. ¶ 21.  This, however, mis-states the nature of City Bank's complaint.  Merely taking out the City Bank loan through a refinancing would not have been tortious.  Neither would have been a gift of $4,000,000 to SamCorp nor an equity injection in a like amount.  But, as should be common knowledge in the present commercial climate, over-leveraging a business by allowing it to carry too much debt is a dangerous practice.  Indeed, City Bank recognized this danger and sought to avoid it with the no-additional-debt covenant included in the SamCorp loan agreement.  It is inducing the violation of *this* provision about which City Bank complains.  *See* City Bank S.J. Resp. 10 ("SNB approved a $2,000,000 draw directly to SamCorp without ever checking that City Bank was paid off.  The natural consequence of these actions was to cause SamCorp to breach its agreement with City Bank.").

actual damages here because City Bank is left with a priority lien over the accounts receivable loan collateral, which should generate more than enough proceeds to cover the outstanding indebtedness on the loan.  Compass Bank S.J. Mot. ¶ 21.  Indeed, there is some evidence which suggests that SamCorp had approximately $10,000,000 in uncollected receivables at the time the default was called in January 2008, over which City Bank had a priority lien to secure its $3,000,000 loan.  *See* Owen Dep. 127:8-22; *see also* SamCorp Fin. Statements as of Sept. 30, 2007 (Doc. No. 51-26 Ex. 16).  Furthermore, there is evidence showing that City Bank has already collected close to half of the total loan amount, and has been able to collect at least one receivable from SamCorp's customers and partners in recent months.  *See* Rush Dep. 119:18-120:15, 123:7-127:14.  On the other hand, there is evidence showing that, notwithstanding the face-value amounts, the true value of such receivables and the speed of their collection decreases after a general contractor's business fails.  *See id.* at 92:12-93:13. At present, the extent to which City Bank mitigated its damages, or failed to mitigate them, is unknown.  Accordingly, the Court finds that there are fact questions concerning the degree to which the value of the collateral was impaired by the actions of the various parties, exactly how much City Bank is still owed on its SamCorp loan, and whether City Bank ultimately suffered uncompensated damages.  This precludes summary judgment.

For the reasons set forth above, Compass Bank is entitled to summary judgment on City Bank's conversion claim, but summary judgment is denied on all other points.

## V.     COLLATERAL MATTERS

### A.     Severing and Consolidating Claims

City Bank's claim for tortious interference with contract has survived summary judgment and is ripe for further proceedings.  However, its conversion claim has been rejected on

summary judgment, and its fraudulent transfer claims have been referred to bankruptcy court, all as noted above.  The Court also notes the fact that City Bank has further outstanding tort claims, arising from the transactions at issue in this case, pending in the sister case before this Court numbered EP-10-CV-62-KC.  Accordingly, in the exercise of its prerogative under Rule 21 and its inherent powers to control its docket and ensure consistent and efficient adjudication of cases, the Court deems it appropriate to sever, on its own motion, the tortious interference claim from the instant case and consolidate it into cause number EP-10-CV-62-KC.  *See* FED. R. CIV. P. 21 ("The court may also sever any claim against a party.").  This will ensure that all tort claims between City Bank and Compass Bank, arising out of the SamCorp transactions, will be litigated together, and that awards and assessments of any damages will be consistent and non-duplicative.  An appropriate order will be entered in that case to reflect this decision.

###### B.      City Bank's Motion to Amend its Complaint

City Bank has requested leave of the Court to amend its complaint to assert various tort claims.  *See generally* City Bank Mot. to Amend Complaint.  But these tort claims have also come before this Court in cause number EP-10-CV-62-KC, and the Court intends to consider these claims in the context of that case; accordingly, there is no need to bring them into this case too.  For that reason, the Court denies the City Bank Motion to Amend Complaint as moot.

###### C.      Compass Bank's Motion to Amend Reply

Compass Bank has moved to amend its reply to City Bank's Response to its Motion for Summary Judgment.  *See generally* Compass Bank Mot. to Amend Reply.  This request was made in order to bring the Reply into compliance with the page limits contained in the local rules (the original version was inadvertently too long), and is unopposed by City Bank.  *Id.* ¶¶ 1-2. Accordingly, the motion is granted and the Court has regarded the amended Reply as the correct one when considering the summary judgment issues.

### D.     City Bank's Motion to Strike

City Bank has moved to strike Compass Bank's original summary judgment Reply because of its excessive length.  *See generally* City Bank's Mot. to Strike.  However, in light of the fact that the Court has accepted the Amended Reply, which complies with the applicable page limits, as the correct document in lieu of the original Reply, the Court finds that there is no need for this remedy.  Accordingly, City Bank's Motion to Strike is denied as moot.

### E.     Staying Case

The Court previously vacated the May 28, 2010, trial date in this case, due to the pendency of the dispositive motions considered here and the fast-approaching trial date.  *See* Order Vacating Trial Date, Apr. 29, 2010 (Doc. No. 72).  In light of the Court's disposition of the matters discussed above – namely, the referral of the fraudulent transfer claims to bankruptcy court, the disposition of the conversion claim on summary judgment, and the severance of the remaining tortious interference claim and its consolidation into cause number EP-10-CV-62-KC – the Court finds it appropriate to stay the instant case.  The Court will resume consideration of the matters remaining in this case – principally, Compass Bank's request to foreclose on the Disputed Assets – in the event the bankruptcy court rules that they are not to be returned to the bankruptcy estate.  Accordingly, the parties shall jointly file notice with this Court one week after the bankruptcy court resolves all the matters referred to it, which shall describe the resolution so achieved and contain copies of any relevant bankruptcy court opinions.  Said joint notice shall not exceed five (5) pages of original text, but may contain any number of pages of relevant bankruptcy court opinions.

## VI.     CONCLUSION AND ORDERS

For the reasons set forth above, the Court makes the following findings and enters the following orders:

(1) The Court **FINDS** the Miller Pleadings filed in the Miller Supplement to be adequate,

and so **REFERS** the subject matter discussed therein, including all claims sounding in a theory of fraudulent transfer, to the bankruptcy court.

(2) The Court **GRANTS** in part and **DENIES** in part the Compass Bank 12(b)(1) Motion.  The Motion is **GRANTED** as to the fraudulent transfer claims over the Disputed Assets.  The Motion is **DENIED** as to the fraudulent transfer claims over the million dollar payment.

(3) The Court **GRANTS** in part and **DENIES** in part the Compass Bank Summary Judgment Motion.  The Motion is **GRANTED** on the issue of conversion, but **DENIED** as to the tortious interference claim.

(4) The Court **SEVERS** the surviving tortious interference claim alleged by City Bank against Compass Bank, and **CONSOLIDATES** that claim into cause number EP-10-CV-62-KC.

(5) The Court **DENIES** the City Bank Motion to Amend Complaint as **MOOT**.

(6) The Court **GRANTS** the Compass Bank Motion to Amend Reply.

(7) The Court **DENIES** City Bank's Motion to Strike as **MOOT**.

(8) The Court **STAYS** further proceedings in this case until the Banktruptcy Court has resolved the matters referred to it; and,

(9) **ORDERS** the parties to file a joint notice with this Court **one week** after the bankruptcy court resolves the claims referred to it, describing the resolution achieved and containing copies of any relevant bankruptcy court opinions.

**SO ORDERED.**

**SIGNED** on this 12th day of May 2010.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE